**GREAT WEST CASUALTY COMPANY, a Nebraska corporation, and International Business & Mercantile Reassurance Company, an Illinois corporation, Plaintiffs,**

**v.**

**The TRAVELERS INDEMNITY COMPANY, a Connecticut corporation, Defendant.**

**Civ. No. 94–5060.**

United States District Court,
D. South Dakota,
Western Division.

May 9, 1996.

1456

Gregory A. Eiesland, Quinn, Eiesland, Day & Barker, Rapid City, SD, for plaintiffs.

Roger W. Damgaard, Woods, Fuller, Schultz & Smith, Sioux Falls, SD, for defendant.

## MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BATTEY, Chief Judge.

### NATURE AND PROCEDURAL HISTORY

On August 19, 1994, plaintiffs commenced this lender liability action against defendant, specifically alleging claims of conversion (Count I), tortious interference with contractual relations (Count II), negligence (Count III), and breach of fiduciary duty (Count IV). On January 31, 1996, defendant filed a motion for summary judgment contending that the undisputed facts in the record fail to establish or rise to the level of actionable control to support plaintiffs' lender in control theory. On February 27, 1996, plaintiffs filed their brief opposing summary judgment asserting that there is a genuine issue of material fact as to whether defendant had exerted actionable control. Plaintiffs further contend that control is neither an element of, nor particularly relevant to, several of their causes of action.

The Court has jurisdiction under 28 U.S.C. § 1332.

### FACTS

Plaintiff Great West Casualty Company (Great West) is a Nebraska corporation authorized to transact insurance business in South Dakota. Plaintiff International Business & Mercantile Reassurance Company (IB & MR) is an Illinois corporation also

authorized to transact insurance business in South Dakota. IB & MR specializes in business failing to satisfy Great West's underwriting requirements. Defendant Travelers Indemnity Company (Travelers) is a Connecticut corporation authorized to transact business in South Dakota. First American Systems, Inc. (FAS) was an independent insurance agency which operated agencies in Rapid City (Kluthe & Lane Insurance Agency), Mitchell (First American Insurers), Sturgis (Bear Butte Insurance Agency), and Spearfish (First American Insurers). FAS was also the majority stockholder in North Wyoming Insurance Agency at Buffalo, Wyoming.

On May 1, 1987, Travelers and FAS entered into a loan agreement whereby Travelers loaned FAS $900,000 in exchange for a security interest in general intangibles, expiration and renewals, and other collateral of FAS.[1] *See* Defendant's Statement of Material Facts ¶¶ 17, 18. In the summer and early fall of 1988, Travelers had on several occasions contacted Edward James Smith, a Wisconsin businessman, about the prospect of Smith's purchasing FAS. *See* Plaintiffs' Statement of Material Facts ¶ 79. In the fall of 1988, Smith purchased a controlling interest in FAS through First American Holding Company of which he is the sole shareholder. *Id.* at ¶ 80. Smith borrowed approximately $300,000 from Travelers, which he and his wife Attracta O. Smith personally guaranteed. *Id.* at ¶ 81. Smith and his wife also assumed approximately 52 percent of the remainder of FAS's $900,000 obligation to Travelers. *Id.* Smith assumed the role of president of FAS, and John Hutson became FAS's executive vice-president and general manager on November 1, 1988. *See* Defendant's Statement of Material Facts ¶¶ 2, 3. Hutson as the manager of FAS became the contact person between Smith and Travelers. *See* Plaintiffs' Statement of Material Facts ¶ 84. FAS's board of directors consisted of Smith, his wife, and Hutson. *See* Defendant's Statement of Material Facts ¶ 6. At no time did Travelers own any stock in FAS,

attend any shareholder meetings, vote or attempt to vote any stock of FAS, have any employees on FAS's board of directors, or have any employees who were officers of FAS. *Id.* at ¶ 7.

The loan agreement entered into by Travelers and FAS in May of 1987 was subsequently amended at the time Smith purchased a controlling interest in FAS through First American Holding Company. *Id.* at ¶ 22. The loan documents precluded FAS from selling any of its assets outside of the ordinary course of business absent Travelers' consent. *Id.* at ¶ 34. The documents further provided Travelers with significant commercial rights as a secured party, including reporting requirements and default provisions. *Id.* at ¶ 35. Pursuant to the agreements, a default occurs if "Travelers shall at any time in good faith deem itself insecure with respect to repayment under the Loan Agreement or Promissory Note." *See* Plaintiffs' Statement of Material Facts ¶ 86.

FAS sold insurance products for approximately 25 to 30 companies, including the parties to this litigation. *See* Defendant's Statement of Material Facts ¶ 10. FAS served as plaintiffs' general agent for the purpose of procuring applications and proposals for various classes of insurance, for the collecting and receiving of premiums paid on such insurance, and for the payment of such premiums to plaintiffs after their collection. *See* Plaintiffs' Statement of Material Facts ¶ 1. Pursuant to numerous agency contracts entered into with plaintiffs, the monies received by FAS for premiums or otherwise were to be held in trust, maintained in a segregated account, and paid to plaintiffs not later than 45 days following the last day of the month in which the transactions occurred. *See* Plaintiffs' Complaint ¶ VII. From 1992 through 1994, plaintiffs' share of FAS's total premium business was a little under 10 percent of FAS's total premium business. *See* Defendant's Statement of Material Facts ¶ 14. During the 1992 through 1994 time frame, FAS also acted as Travel-

---

1. Travelers executed various UCC–1 financing statements that were filed with the South Dakota Secretary of State perfecting a security interest in FAS's book of business which included general intangibles, expirations, renewals, as well as other assets. *See* Defendant's Statement of Material Facts ¶ 25.

ers' general agent for the sale of Travelers' property and casualty financial services products. *Id.* at ¶ 8. Travelers' share of FAS's total premium business was at its highest in the 20 percent range, and declined to less than 10 percent by May of 1994 when FAS filed its voluntary Chapter 7 petition in bankruptcy. *Id.* at ¶ 11–13.

FAS collected all of its revenue and receipts, including premiums from hundreds of policyholders, and deposited them in FAS's commingled general accounts. *Id.* at ¶¶ 86, 90, 92. FAS made disbursements from its general accounts, including payments to the parties of this action. *Id.* at ¶ 91. The only signatures necessary for the disbursement of funds was that of FAS personnel. *Id.* at ¶ 88. Travelers was never a signatory on any of FAS's bank accounts. *Id.* at ¶ 87.

In 1992 Travelers' representatives conducted various cost-related studies with regard to FAS's business. *Id.* at ¶ 93. Based on the information obtained from the study, Travelers recommended that FAS reduce its acquisition costs including gross commissions and fringe benefits paid to its agents. *Id.* at ¶ 94. *See also* Plaintiffs' Statement of Material Facts ¶ 12. It is undisputed that FAS personnel decisions were made by FAS. Travelers did not dictate to FAS which employees to hire, fire, promote, transfer, or demote. *See* Defendant's Statement of Material Facts ¶¶ 100, 101. Furthermore, on a day-to-day basis, Travelers did not mandate to FAS what company payables or operating expenses to pay and which not to pay. *Id.* at ¶ 59. Although there is no evidence in the record indicating that Travelers ordered FAS to implement the recommended changes, Travelers' status as both a major creditor and client of FAS was undoubtedly a contributing factor in Smith's instruction to Hutson to design and implement a plan to reduce acquisition costs. *Id.* at ¶ 95. In June of 1992, FAS implemented a plan to reduce its acquisition costs. *Id.* at ¶ 96. Even though Smith contended that the reduction of acquisition costs was a good business decision in light of the fact that it brought FAS's expenses in line with the rest of the insurance community, the reduction contributed to the departure of several FAS

employees which in turn affected the overall financial viability of FAS. *Id.* at ¶¶ 98, 99.

From 1992 through 1994, Travelers became involved in several meetings for the purpose of influencing the sale of some or all of FAS's agencies due to a decline in FAS's financial status. In April of 1992, Smith suggested in a letter to Travelers that the financial problems FAS was experiencing could possibly be remedied by: (1) the sale of his controlling interest to Hutson; (2) the sale of the property and casualty business of the Kluthe & Lane Agency in Rapid City to Donita Haley, the manager for Kluthe & Lane Insurance; or (3) the sale of the property and casualty business of the Kluthe & Lane Agency to Cummings & Roll Agency, headquartered in Rapid City. *See* Letter from Edward James Smith, President of FAS, to Joe Simao, Jr., Travelers' manager of agency finance (April 16, 1992) (Plaintiffs' Exhibit 31 attached to Deposition Transcript of Joe Simao, Jr., found at Exhibit 1 of Travelers' Supplemental Record in Support of Motion for Summary Judgment). Smith, Hutson, and Travelers' personnel met to discuss the potential sale to Hutson; however, Hutson decided not to purchase Smith's interest in FAS because of FAS's financial instability. *See* Deposition Transcript of John Hutson at 94; Deposition Transcript of Joe Simao, Jr. at 87–89. In the late spring, early summer of 1992 Haley and Travelers' personnel met in Rapid City to discuss the possible purchase of FAS by Haley and a group of FAS managers. *See* Plaintiffs' Statement of Material Facts ¶ 20. Prior to the commencement of the meeting, Travelers instructed Haley that it did not want Hutson to know about the meeting due to the fact that she was a competing purchaser with Hutson. *Id.* at ¶ 21.

On June 4, 1992, Travelers' manager of agency finance, Joe Simao, Jr., circulated an electronic mail message to eleven Travelers' employees advising them of the potential sale of FAS or several of its agencies. *Id.* at ¶ 24. On September 29, 1992, counsel for Travelers sent a letter to Smith advising him that Travelers was aware that minority stockholders had previously made serious purchase offers for the Mitchell location of FAS and

the North Wyoming Insurance Agency and that Smith had rejected those offers. *Id.* at ¶ 26. The letter further set forth Travelers' position that FAS could no longer "ignore existing financial problems and must take prompt, significant and substantial steps to resolve them." *See* Letter from Roger W. Damgaard, Travelers' legal counsel, to Edward James Smith, President of FAS, (Sept. 29, 1992) (Plaintiffs' Exhibit 1 found at Exhibit G of Plaintiffs' Supplemental Record in Support of Opposition to Motion for Summary Judgment). In the spring of 1993, Travelers continued to exert pressure upon FAS to explore prospective sales of several of its agencies including both the Sturgis and Mitchell branches. *See* Plaintiffs' Statement of Material Facts ¶ 36. At this juncture, there is no evidence in the record indicating that Travelers had dictated the sale of any of FAS's agencies.

FAS's financial position continued to deteriorate and on February 4, 1994, Travelers notified FAS that it was in default on its loan obligations to Travelers.[2] *See* Defendant's Statement of Material Facts ¶ 42. On February 7, 1994, representatives of Travelers met with Smith and Hutson in Rapid City to discuss the future of FAS. *Id.* at ¶ 43. At the meeting Travelers' representatives informed Smith that it was time to begin selling FAS's agencies. *Id.* at ¶ 44. It was Travelers' position that under the prior loan agreements, it had a right to demand that FAS voluntarily liquidate Travelers' collateral or Travelers would foreclose. *Id.* at ¶ 45. Initially, FAS agreed to seek purchasers for its books of business. *Id.* at ¶¶ 47, 49. After the February 7, 1994, meeting between Travelers and FAS, both parties met with Norwest Bank representatives to discuss Norwest Bank's previous interest in purchasing FAS. *See* Plaintiffs' Statement of Material Facts ¶¶ 51, 52. At the meeting the bank's representatives expressed an interest in purchasing FAS. *Id.* at ¶ 54. However, FAS's financial statements, tax returns, and accounting data had been forwarded to the bank's director of acquisitions in Minneapolis, and it would take five to six months to obtain the necessary approval. *Id.* Travel-

ers' representatives informed the bank that a decision would have to be made in ten days. *Id.* at ¶ 55. Shortly thereafter, the bank informed FAS that Norwest would be unable to make a decision within that time frame, and therefore it should not be considered as a bona fide buyer. *Id.* at ¶ 56.

On March 8, 1994, FAS negotiated the sale of its shares in the North Wyoming Insurance Agency. *See* Defendant's Statement of Material Facts ¶ 47. Prior to the sale, Smith had received a phone call from Michael L. Policastro, a Travelers executive. *See* Plaintiffs' Statement of Material Facts ¶ 67. After the conversation, Smith advised Hutson that in spite of advice and consideration, he had no choice but to go through with the closure of the sale of the North Wyoming Insurance Agency because Policastro had threatened to advise Smith's wife of the content of certain papers that she had signed with regard to the personal guarantees to Travelers. *Id.* According to Smith, he was acting as Travelers' "puppet." *Id.* at ¶ 71. In early 1994, Cummings & Roll had also expressed an interest in purchasing a portion of FAS. *Id.* at ¶ 61. Travelers concluded that the sale would be made to Western Dakota Insurers instead of Cummings & Roll. *See* Plaintiffs' Statement of Material Facts ¶ 63.

After the sale of the North Wyoming Agency, FAS, through its attorneys, informed Travelers it would not cooperate with Travelers in the sale of the remaining agencies and books of business absent an agreement from Travelers to release its secured proceeds to pay insurance company payables. *See* Defendant's Statement of Material Facts ¶ 49. FAS was represented by separate legal counsel during the ensuing negotiations between Travelers and FAS. *Id.* at ¶ 50. Due to the inability of the parties to reach an agreement on the payment of unsecured insurance company payables and the sale of the other agencies, Travelers served FAS with a foreclosure action on April 8, 1994. *Id.* at ¶ 51. Subsequent to the foreclosure action the parties, represented by separate

2. Travelers received its last regular monthly payment on the $900,000 note with FAS on February 28, 1994. *See* Defendant's Statement of Material Facts ¶ 38.

legal counsel, negotiated an agreement wherein the proceeds from the sale of the remaining books of business would be held in escrow pending further agreement of the parties or court order. *Id.* at ¶ 54. Finally, on May 12, 1994, FAS filed a voluntary Chapter 7 bankruptcy petition. *Id.* at ¶ 55.

Travelers had received its last insurance company payable remittance from FAS on February 15, 1994. *Id.* at ¶ 67. Thus, FAS was in default to Travelers for failure to timely pay premium payables after March 15, 1994. *Id.* at ¶ 82. FAS still owes Travelers premium payables of $151,803.42 plus interest. *Id.* at ¶ 71. Plaintiffs continued to receive premium payments after Travelers had received its last payments. In March, April, and May of 1994, plaintiffs received from FAS a total amount of $242,419.98 in insurance premium payments. *Id.* at ¶ 80. Of these payments, an amount of $98,864.98 was made less than forty days prior to FAS's bankruptcy filing on May 12, 1994. *Id.* at ¶ 81. FAS owes plaintiffs $301,081.04 plus interest in premium payables. *See* Affidavit of Donna M. Jahr, Exhibits C–F.

## SUMMARY JUDGMENT STANDARD

██ Under Rule 56 of the Federal Rules of Civil Procedure, a movant is entitled to summary judgment if the movant can "show that there is no genuine issue as to any material fact and that [the movant] is entitled to judgment as a matter of law." *Poller v. Columbia Broadcasting, Inc.,* 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458, 488 (1962). In determining whether summary judgment should issue, the facts and inferences from those facts are viewed in the light most favorable to the nonmoving party and the burden is placed on the moving party to establish both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–90, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence must set forth specific facts showing that a genuine issue of material fact exists.

██ In determining whether a genuine issue of material fact exists, the Court views the evidence presented based upon which party has the burden of proof under the underlying substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 253–55, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). Recently, the Supreme Court noted that "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to 'secure the just, speedy, and inexpensive determination of every action.'" *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). The nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts," *Matsushita,* at 586, 106 S.Ct. at 1356, and "[w]here the record as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.*

██ The trilogy of *Celotex, Anderson,* and *Matsushita* provide the Court with a methodology in analyzing defendant's motion for summary judgment. *See generally* 1 Steven A. Childress & Martha S. Davis, *Federal Standards of Review* § 5.04 (2d ed. 1991) (discussing the standards for granting summary judgment that have emerged from *Matsushita, Celotex,* and *Anderson* ). Under this trilogy, it is incumbent upon the nonmoving party (plaintiffs), based upon the showing set forth by the moving party (defendant), to establish significant probative evidence to prevent summary judgment. *See Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank,* 934 F.2d 976, 979 (8th Cir.1991).

## DISCUSSION

### A. *South Dakota Law*

██ South Dakota law governs the substantive issues in this diversity case. *B.B. v. Continental Ins. Co.,* 8 F.3d 1288, 1291 (8th Cir.1993). The South Dakota Supreme Court has spoken on the issues of when and under what circumstances the corporate entity may be disregarded. *See generally Kan-*

sas Gas & Elec. Co. v. Ross, 521 N.W.2d 107 (S.D.1994) (piercing the corporate veil in the context of shareholder, officer, or director liability for corporate debts); *Baatz v. Arrow Bar*, 452 N.W.2d 138 (S.D.1990) (individual shareholder liability when piercing the corporate veil); *Glanzer v. St. Joseph Indian School*, 438 N.W.2d 204 (S.D.1989) (a parent corporation's liability for acts of its subsidiary under the instrumentality doctrine). However, this case presents a fact situation not yet directly resolved by the South Dakota Supreme Court. Typically, a plaintiff either seeks to invoke the corporate disregard doctrine to hold a parent corporation liable for the acts of one of its subsidiaries or to hold a corporation's officers, directors, or shareholders liable for the corporation's debts. This case is unique to established South Dakota precedent in that plaintiffs have proceeded on a theory that defendant Travelers assumed the role as the dominant corporation, and as such should be held liable for the debts of the subservient corporation, FAS.

Although the South Dakota Supreme Court has not directly resolved the issues presented by this case, existing South Dakota precedent addressing disregard of the corporate entity, combined with decisions from other jurisdictions reflecting South Dakota policy in the context of a dominant corporation's liability for a subservient corporation's debt will aid this Court in determining what the South Dakota Supreme Court would "probably hold were it called upon to decide the issue." *B.B.*, 8 F.3d at 1291 (quoting *Gilstrap v. Amtrak*, 998 F.2d 559, 560 (8th Cir.1993)). *See also Meredith v. City of Winter Haven*, 320 U.S. 228, 64 S.Ct. 7, 88 L.Ed. 9 (1943) (holding that difficulty ascertaining what a state supreme court may subsequently determine state law to be is not by itself a sufficient ground for a federal court to decline to decide a case properly within diversity jurisdiction).

According to the South Dakota Supreme Court, a parent corporation is liable for the acts of its subsidiary when "(1) the parent controls the subsidiary to such a degree as to render the latter the mere instrumentality of the former, and (2) adherence to the rule of corporate separateness would produce injustices and inequities." *Glanzer*, 438 N.W.2d at 207. The reasons for disregarding the corporate entities in the context of the parent and subsidiary relationship are the same as exist in the context of a dominant and subservient relationship. *See Fire Ass'n of Philadelphia v. Vantine Paint & Glass Co.*, 133 N.W.2d 426, 431 (N.D.1965). The *Glanzer* court identified the following factors to be indicative of the degree of control necessary to hold the parent company liable:

(a) The parent corporation owns all or most of the capital stock of the subsidiary.

(b) The parent and subsidiary corporations have common directors or officers.

(c) The parent corporation finances the subsidiary.

(d) The parent corporation subscribes to all the capital stock of the subsidiary or otherwise causes its incorporation.

(e) The subsidiary has grossly inadequate capital.

(f) The parent corporation pays the salaries and other expenses or losses of the subsidiary.

(g) The subsidiary has substantially no business except with the parent corporation or no assets except those conveyed to it by the parent corporation.

(h) In the papers of the parent corporation or in the statements of its officers, the subsidiary is described as a department or division of the parent corporation, or its business or financial responsibility is referred to as the parent corporation's own.

(i) The parent corporation uses the property of the subsidiary as its own.

(j) The directors or executives of the subsidiary do not act independently in the interest of the subsidiary but take their orders from the parent corporation in the latter's interest.

(k) The formal legal requirements of the subsidiary are not observed.

*Glanzer*, 438 N.W.2d at 207 (citing Powell, *Parent and Subsidiary Corporations*, § 5–6,

**1464**

at 9 (1931)). In *Loving Saviour Church v. United States,* 556 F.Supp. 688 (D.S.D.1983) (J., Jones), there was a recognition that the South Dakota Supreme Court views each case to be *sui generis* requiring consideration in accordance with its own underlying facts. *Id.* at 692 (citing *Mobridge Community Indus. v. Toure, Ltd.,* 273 N.W.2d 128, 132 (S.D.1978)). Based on the foregoing, the Court will proceed to address plaintiffs' lender in control theory.

## B. *Lender in Control*

In paragraph IX of their complaint, plaintiffs allege

> That Travelers engaged in a course of conduct wherein it managed and directed FAS by directing the management of FAS and its subsidiaries through telephone calls, faxes, correspondence, directive memos, and interoffice communications within Travelers and with FAS. By these actions, Travelers controlled and affected the essential business of FAS. That FAS was put in a continually worsening financial condition by Travelers' mismanagement of FAS.

Both parties have cited the Fifth Circuit Court of Appeal's decision of *Krivo Industrial Supply Co. v. National Distillers & Chemical Corp.,* 483 F.2d 1098, 1102 (5th Cir.1973), in support of their respective positions on lender liability. *Krivo* addressed the circumstances upon which a creditor corporation may be held liable for the obligations of its corporate debtor. *See* 1 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 43.10 (perm. ed. rev. 1990). From the outset, the *Krivo* court recognized that "[o]ne of the most difficult applications of the rule permitting the corporate form to be disregarded arises when one corporation is sought to be held liable for the debts of another corporation." *Krivo,* 483 F.2d at 1102. Even so, there are instances upon which liability will affix to a dominant corporation.

In formulating a basis for predicating liability of a dominant corporation for the obligations of another corporation, various legal theories and descriptive terms have been employed to describe the requisite relationship. *Id.* at 1103. These bases include identity and labeling the subservient corporation as the instrument, agent, adjunct, branch, dummy, department, or tool of the dominant corporation. *Id.* The *Krivo* court concluded that "instrumentality" is the nomenclature most frequently and best used to describe the relationship between the dominant corporation and subservient corporation. *Id.* Because the South Dakota Supreme Court follows this same characterization in *Glanzer,* 438 N.W.2d at 207, this Court is persuaded to also adopt "instrumentality" as descriptive of the relationship. Under the instrumentality doctrine, a dominant corporation may be held liable for the debts of a subservient corporation "when it misuses that corporation by treating it, and by using it, as a mere business conduit for the purposes of the dominant corporation." *Krivo,* 483 F.2d at 1103 (citing 1 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 43 (perm. ed. rev. 1963)).

The *Krivo* court determined the two elements essential for liability under the instrumentality doctrine to be: (1) control; and (2) proximate cause through the misuse of the control. *Krivo,* 483 F.2d at 1103. In addition to these two elements, the instrumentality doctrine also requires that a fraud or injustice must also result from the use of the control. *Id.* at 1106. *See also Radaszewski by Radaszewski v. Contrux, Inc.,* 891 F.2d 672, 674 (8th Cir.1989) (applying Missouri law); *National Bond Fin. Co. v. General Motors Corp.,* 238 F.Supp. 248, 255 (W.D.Mo.1964); *Omaha Pollution Control Corp. v. Carver–Greenfield,* 413 F.Supp. 1069, 1091 (D.Neb.1976); 1 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 43.10 (perm. ed. rev. 1990). Because under South Dakota law injustice is an essential element in holding a parent corporation liable for the acts of its subsidiary, injustice would add a third element. *See Glanzer,* 438 N.W.2d at 207.

According to the Fifth Circuit, [T]he control required for liability under the "instrumentality" rule amounts to total dominion of the subservient corporation, to the extent that the subservient corporation manifests no separate corporate interests

of its own and functions solely to achieve the purposes of the dominant corporation. *Krivo,* 483 F.2d at 1106. In so holding, the Fifth Circuit adopted Professor Fletcher's recommendation that,

> The control necessary to invoke what is sometimes called the "instrumentality rule" is not mere majority or complete stock control but such dominion of finances, policies and practices that the controlled corporation has, so to speak, no separate mind, will or existence of its own and is but a business conduit for its principle.

*Id.* (quoting 1 W. Fletcher, *Cyclopedia of the Law of Private Corporations* § 43 (perm. ed. rev. 1963)). Finally, after a thorough examination of "instrumentality" cases involving creditor-debtor relationships, the *Krivo* court determined that,

> [C]ourts require a strong showing that the creditor *assumed actual, participatory, total control* of the debtor. Merely taking an active part in the management of the debtor corporation does not automatically constitute control, as used in the "instrumentality" doctrine, by the creditor corporation.

*Id.* at 1105 (emphasis added). The *Krivo* court relied on the Eighth Circuit case of *Chicago Mill & Lumber Co. v. Boatmen's Bank,* 234 F. 41 (8th Cir.1916), to exemplify the broad scope of restriction a creditor is permitted to institute on its debtor's activities. *Krivo,* 483 F.2d at 1105.

As a practical matter, a certain amount of control and influence over a debtor is simply consistent with a creditor's responsibility to protect the investment. *Id.* In *Chicago Mill & Lumber Co.,* a bank lent large sums of money to a mill and land company. *Chicago Mill & Lumber Co.,* 234 F. at 44. After the bank had become dissatisfied with the management of the mill and land company, it participated in the sale of the debtor company to an interested third party. *Id.* at 43. In order to further protect its investment, the bank had its assistant cashier elected president of the company. *Id.* at 43, 44. The manager of the company testified that he received his operating directions from either the president of the bank or the assistant cashier. *Id.* at 44. Eventually, the company went into bankruptcy and a second creditor of the company sued the bank on the theory that the bank was liable for the company's other debts based on the bank's management and control over the bankrupt company's affairs. *Id.* The Eighth Circuit affirmed the district court's directed verdict for the bank, stating that

> Comprehensively speaking, [the activities of the bank] are all easily and naturally referable to a legitimate and customary practice of keeping an oversight by a creditor over the business, management, and operations of a debtor of doubtful solvency. All the facts of this case and all the reasonable inferences deducible from them would not, in our opinion, have warranted a jury in finding ... that the [bank] was carrying on the business of the [company] as part of its own.

*Id.* at 46 (quoted by *Krivo,* 483 F.2d at 1105).

Defendant contends that the undisputed facts of this case are insufficient to establish that Travelers "assumed actual, participatory, total control" of FAS so as to invoke liability under the instrumentality doctrine. The Court agrees.

Plaintiffs assert that Travelers did exert actual control over FAS by:

(1) carefully orchestrating who would buy FAS and assume Travelers' loan to FAS;

(2) drafting security provisions so broad that Travelers could declare a default at its whim; and

(3) imposing such severe personal obligations upon the new agency owner, E.J. Smith, that he had little choice but to acquiesce to Travelers' demands.

*See* Plaintiffs' Memorandum in Opposition to Summary Judgement at 18. Plaintiffs' first contention that Travelers assumed actual control by orchestrating Smith's purchase of FAS, combined with Smith's assumption of the loan is misplaced. It is undisputed that at no time did Travelers own any stock in FAS, attend any shareholder meetings, vote or attempt to vote any stock of FAS, have any employees on FAS's board of directors,

or have any employees who were officers of FAS. It is true that courts have held that "the fact that the allegedly dominant corporation held *no* stock ownership interest in the allegedly subservient corporation has not precluded application of the 'instrumentality' rule where actual and total control has been otherwise established. *Krivo*, 483 F.2d at 1104. However, at best Travelers' solicitation of Smith to purchase FAS and assume a portion of the debt is "minimally indicative of control, it can hardly be said to rise to the level justifying disregard of the [separate] corporate forum." *Joslyn Corp. v. T.L. James & Co.*, 696 F.Supp. 222 (W.D.La.1988) (adhering to the general rule set forth in *Krivo* that "the mere loan of money by one corporation to another does not automatically make the lender liable for the acts and omissions of the borrower."). *See also Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145 (3d Cir.1988) (holding that parent company's majority share of stock ownership gave it potential control by creating an "omnipresence in the minds of subsidiaries board of directors" which is not sufficient to invoke liability). Furthermore, Travelers' various attempts from 1992 through 1994 to sell Smith's controlling interest in FAS evidences the fact that Travelers did not have control over Smith's actions.

Plaintiffs' assertion that Travelers "assumed actual, participatory, total control" of FAS by drafting security provisions so broad that Travelers could declare a default at its whim is wholly unsupported by law. Pursuant to the loan agreements between Travelers and FAS, a default occurs if "Travelers shall at any time in good faith deem itself insecure with respect to repayment under the Loan Agreement or Promissory Note." There is no evidence in the record to suggest that the loan documents were negotiated at anything other than arm's length or that they are atypical of loan documents used in similar debtor-creditor relationships. *See Matter of Clark Pipe & Supply Co.*, 893 F.2d 693, 700 (5th Cir.1990) (recognizing that a lender "will usually possess 'control' in the sense that it can foreclose or drastically reduce the debtor's financing."). The evidence taken in the light most favorable to plaintiffs shows not that Travelers took absolute and total control of FAS by including a default provision based upon good faith determination of insecurity, "but rather it took steps to minimize its risks as a major creditor of [FAS]." *James E. McFadden, Inc. v. Baltimore Contractors*, 609 F.Supp. 1102, 1105 (E.D.Pa.1995) (holding that loan requirements were imposed by lender to insure payment on the loan and did not manifest total and actual control over debtor).

Plaintiffs further contend that Travelers assumed actual control by imposing such severe personal obligations upon Smith that he had little choice but to acquiesce to Travelers' demands. This assertion stems in part from the March 8, 1994, sale of the North Wyoming Insurance Agency. After the conversation with Policastro concerning the sale, Smith had informed Hutson that he had no choice but to go through with the closure of the sale of the North Wyoming Insurance Agency because Policastro had threatened to advise Smith's wife of the content of certain papers that she had signed with regard to the personal guarantees to Travelers. According to Smith, he was acting as Travelers' "puppet." Plaintiffs' argument fails in light of the fact that Travelers as a major creditor had a right to require Smith and his wife to personally guarantee all or part of the FAS debt in order to protect its investment. To require personal guarantees is a fact of life in the corporate commercial loan world. Plaintiffs have not presented any evidence to suggest that the loan documents were negotiated at anything other than arm's length or that they are atypical of loan documents used in similar financings. *See Matter of Clark Pipe & Supply Co.*, 893 F.2d at 700. The fact that Travelers solicited Smith to purchase the agency evidences that at the very least Smith was in a position to strike a satisfactory arrangement or walk away from the purchase negotiations. Plaintiffs place significant accord to Smith's assertion that he was acting as Travelers' "puppet." However, as the evidence in this case indicates, this is nothing more than a conclusory opinion. Such facts even if true do not rise to the level of establishing "actual, participatory, total control." *See James E. McFadden, Inc.*, 609 F.Supp. at 1108.

In 1992, Travelers proffered several recommendations to FAS concerning a reduction in its acquisition costs including gross commissions and fringe benefits paid to its agents. It is undisputed that it was Smith's opinion that the reduction in acquisition costs was a good business decision in light of the fact that it brought FAS's expenses in line with the rest of the insurance community. Although there is no evidence in the record indicating that Travelers ordered FAS to implement the recommended changes, Travelers' status as both a major creditor and client of FAS was undoubtedly a contributing factor in Smith's instruction to Hutson to design and implement a plan to reduce acquisition costs. However, existing precedent clearly indicates that a creditor's monitoring of operations and proffering management advice does not constitute control. *Garrett v. BankWest, Inc.*, 459 N.W.2d 833, 839 (S.D.1990) (citing *NCNB Nat'l Bank of North Carolina v. Tiller*, 814 F.2d 931, 936 (4th Cir.1987) (monitoring and protection of collateral are "normal incidents of a borrower-lender relationship" and do not amount to control); *In re W.T. Grant Co.*, 699 F.2d 599, 610–11 (2d Cir.1983) (creditor's monitoring of operations and proffering management advice, without more, does not constitute control); *Cooper v. Union Bank*, 527 F.2d 762, 765 (9th Cir.1975) (provisions in loan agreement giving bank right to accelerate debt if debtor fails to remit monthly activity reports is not control); *Krivo*, 483 F.2d at 1104).

To be sure, Travelers "was a large creditor, and as such largely interested in the prosperity of the company [FAS], and most naturally should desire to keep an oversight over its doings." *Chicago Mill & Lumber Co.*, 234 F. at 46. FAS continued to make its own personnel decisions. Travelers did not dictate to FAS which employees to hire, fire, promote, transfer, or demote. Travelers' various attempts from 1992 through 1994 to sell Smith's controlling interest in FAS exhibits that Travelers did not have control of Smith and that he was not acting as Travelers' "puppet." Furthermore, FAS was represented by separate legal counsel during the sale of several of FAS's agencies including the North Wyoming Agency, as well as during the foreclosure action.

Plaintiffs' contend that Travelers' control is demonstrated by the fact that Travelers' "grabbed its money first." Plaintiffs' assertion is clearly unsupported by the record. It is undisputed that FAS collected all of its revenue and receipts, including premiums from hundreds of policyholders, and deposited them in its commingled general accounts. FAS made disbursements from its general accounts, including payments to the parties of this action. The only signatures necessary for the disbursement of funds was that of FAS personnel. Travelers was never a signatory on any of FAS's bank accounts. On a day-to-day basis, Travelers did not mandate to FAS what company payables or operating expenses to pay and which not to pay. Travelers received its last insurance company payable remittance from FAS on February 15, 1994; therefore, FAS was in default to Travelers for failure to timely pay premium payables after March 15, 1994. However, plaintiffs continued to receive premium payments after Travelers had received its last payments. In March, April, and May of 1994, plaintiffs received from FAS a total amount of $242,419.98 in insurance premium payments. Of these payments, an amount of $98,864.98 was made less than forty days prior FAS's bankruptcy filing on May 12, 1994. Finally, evidence that a creditor "designates the order in which a debtor's creditors are to be paid is not evidence of the control that is necessary to become liable for the debtor's liabilities." *F.C. Imports v. First Nat. Bank*, 816 F.Supp. 78, 92 (D.P.R. 1993) (citing *Krivo*, 483 F.2d at 1111).

Plaintiffs have failed to produce significant probative evidence to controvert defendant's showing of the lack of the requisite control necessary to invoke liability under the instrumentality doctrine so as to prevent summary judgment on that issue. *See Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank*, 934 F.2d 976, 979 (8th Cir.1991).

## C. *Conversion*

Under well-settled South Dakota law,

A conversion occurs whenever there is a serious interference to a party's right in his property. The act constituting "con-

version" must be an intentional act, but it does not require wrongful intent and is not excused by care, good faith, or lack of knowledge.

*Denke v. Mamola,* 437 N.W.2d 205, 207 (S.D. 1989) (quoting *Rensch v. Riddle's Diamonds of Rapid City,* 393 N.W.2d 269, 271 (S.D. 1986)) (other citations omitted). The Restatement (Second) of Torts § 222A(1) further provides that:

> Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel.

See *Rensch,* 393 N.W.2d at 271. Dominion "implies both title and possession and appears to require a complete retention of control over disposition." Black's Law Dictionary 486 (6th ed. 1990).

In Count I of their complaint, plaintiffs allege

> That Defendant Travelers, through unauthorized dominion and control, converted premiums collected for the exclusive right and possession of Plaintiffs and diverted the premiums paid for Plaintiffs' policies into the coffers of Travelers.

The uncontroverted facts pertaining to FAS's collection, deposit, and disbursement of revenues and receipts thoroughly discussed in the Court's lender liability analysis clearly indicates that Travelers did not through unauthorized dominion and control seriously interfere with the collection and disbursement of insurance premiums collected on plaintiffs' behalf.

Plaintiffs have failed to produce significant probative evidence to controvert defendant's showing of the lack of the requisite dominion and control necessary to invoke liability under their conversion theory so as to prevent summary judgment on that issue. *See Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank,* 934 F.2d 976, 979 (8th Cir.1991).

**D.** *Tortious Interference With Contractual Relations*

■■■■■ The essential elements of a cause of action for tortious interference with contractual relations are as follows:

(1) the existence of a valid business relationship or expectancy;

(2) knowledge by the interferer of the relationship or expectancy;

(3) an intentional and unjustified act of interference on the part of the interferer;

(4) proof that the interference caused the harm sustained; and

(5) damage to the party whose relationship or expectancy was disrupted.

*Nelson v. WEB Water Dev. Ass'n,* 507 N.W.2d 691 (S.D.1993) (quoting *Tibke v. McDougall,* 479 N.W.2d 898, 908 (S.D.1992)).

In Count II of their complaint, plaintiffs allege

> That Defendant Travelers acted intentionally to interfere with [plaintiffs and FAS's] contracts by adopting a course of action to divert monies held by virtue of the contracts in trust by FAS for the benefit of Plaintiffs. Said monies were diverted to the use of Defendant. That Defendant played an active and substantial part in causing the loss to Plaintiffs of said monies.

In their Memorandum in Opposition to Defendant's Motion for Summary Judgment, plaintiffs have expanded their theory of tortious interference with contractual relations to encompass allegations that Travelers' activities as a whole ultimately led to FAS's financial demise which resulted in the shortfall of premium payments to plaintiffs. Travelers contends that plaintiffs should not be permitted to expand their original theory which was limited to the diversion of premium payment funds. After viewing plaintiffs' complaint, including the specific claim of tortious interference with contractual relations, it is clear that plaintiffs have satisfied the notice pleading requirement of Fed.R.Civ.P. 8(a)(2). *See generally* 5 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1219, at 188–95 (1990). Therefore, the issue is whether plaintiffs have presented sufficient evidence to support their theory that Travelers' activities as a whole constitute tortious interference with contractual relations in order to preclude a grant of summary judgment in favor of Travelers.

As was the case with plaintiffs' lender in control theory, plaintiffs assert that the 1992 decision to reduce FAS's acquisition costs, Travelers' alleged interference with the collection and disbursement of insurance premiums collected on plaintiffs behalf, and Travelers' various attempts from 1992 through 1994 to sell Smith's controlling interest in FAS constitute intentional and unjustified acts of interference sufficient to support their theory. The undisputed facts of this case fail to advance plaintiffs' contentions of serious unjustified interference. First, as to the implementation of the actual plan to reduce its acquisition costs, Smith agreed that the reduction was a good business decision in light of the fact that it brought FAS's expenses in line with the rest of the insurance community. There is no evidence in the record indicating that Travelers ordered FAS to implement Travelers' recommended changes, and it is undisputed that all FAS personnel decisions were made by FAS. Travelers did not dictate to FAS which employees to hire, fire, promote, transfer, or demote. Even so, an inference may be drawn that Travelers' status as both a major creditor and client of FAS was a contributing factor in Smith's instruction to Hutson to design and implement a plan to reduce acquisition costs. However, pursuant to the loan agreement, Travelers obtained significant commercial rights as a secured party and was justified in its monitoring of operations and proffering management advice. *See generally Chicago Mill & Lumber Co.,* 234 F. at 46 ("the bank was a large creditor, and as such largely interested in the prosperity of the company, and most naturally should desire to keep an oversight over its doings.").

The Court has heretofore concluded that the following undisputed facts demonstrate that Travelers did not seriously interfere with the collection and disbursement of insurance premiums collected on plaintiffs' behalf:

(1) that FAS collected all of its revenue and receipts, including premiums from hundreds of policyholders, and deposited them in its commingled general accounts;

(2) that FAS made disbursements from its general accounts, including payments to the parties of this action;

(3) that the only signatures necessary for the disbursement of funds was that of FAS personnel;

(4) that Travelers was never a signatory on any of FAS's bank accounts; that on a day-to-day basis;

(5) Travelers did not mandate to FAS what company payables or operating expenses to pay and which not to pay; and

(6) that plaintiffs received from FAS a total amount of $242,419.98 in insurance premium payments after Travelers had received its last insurance company payable remittance from FAS.

Finally, plaintiffs assert that Travelers' various attempts from 1992 through 1994 to sell Smith's controlling interest in FAS constitute intentional and unjustified acts of interference sufficient to support their theory. Plaintiffs' contention fails to appreciate the significance of Travelers' rights under the loan documents entered into by Travelers and FAS. Pursuant to the loan documents, Travelers held a security interest in FAS's book of business which included general intangibles, expirations, renewals, as well as other assets. Travelers executed various UCC–1 financing statements that were filed with the South Dakota Secretary of State perfecting a security interest in FAS's book of business. Pursuant to the loan agreement, FAS was precluded from selling any of its assets outside of the ordinary course of business absent Travelers' consent. Furthermore, Travelers could declare a default at any time it made a good faith determination that it deemed itself insecure with respect to repayment. Plaintiffs have failed to present any evidence that Travelers' actions relating to the sale of any FAS agencies were unjustified in that they failed to conform to a required legal standard under applicable commercial law.

Plaintiffs have failed to produce significant probative evidence to controvert defendant's showing of the lack of an unjustified act of intentional interference necessary to invoke

liability under plaintiffs' theory of tortious interference with contractual relations so as to preclude summary judgment on that issue. *See Terry A. Lambert Plumbing, Inc. v. Western Sec. Bank,* 934 F.2d 976, 979 (8th Cir.1991).

### E. *Negligence*

◾ In Count III of their complaint, plaintiffs allege

That defendant Travelers assumed the role and duties of managing and directing the day-to-day operation of FAS. That Travelers by telephone calls to FAS and creditors, letters, faxes, directives, memos and interoffice communication within Travelers set a course of conduct to control and affect the daily business of FAS.

That Defendant Travelers was negligent in disregarding business advice, causing key income generating personnel to leave, enacting policies which caused the demise of FAS, and selling income producing agencies at less than market value.

Plaintiffs' negligence claim is clearly based on plaintiffs' theory that Travelers through its exertion of control effectually became FAS. The Court has already determined in its lender liability analysis that plaintiffs have failed to present sufficient evidence on the issue of control. Therefore, plaintiffs' allegations of negligence are untenable. Absent lender liability there simply existed no duty owed by Travelers to plaintiffs. Absent a duty the negligence claim must fail.

### F. *Fiduciary Duty*

In Count IV of their complaint, plaintiffs allege

That Travelers assumed the implementation and obligations of [the contracts between Plaintiffs and FAS for the remittance of "IN TRUST" payments and existing premiums] by controlling the operation of FAS. That Travelers caused a breach of the fiduciary duty by failing to keep premiums for insurance issued by Plaintiffs' separate and distinct from Plaintiffs' general revenues; by failing to timely disclose material facts to Plaintiffs concerning the financial condition of Defendants' agency; and failing to uphold its responsibilities

to pay all amounts properly due and account for all deficits developed under policies written, for diverting said funds from FAS to Travelers.

Plaintiffs' breach of fiduciary duty claim, as was the negligence claim, is based on plaintiffs' theory that Travelers through its exertion of control effectually became FAS. Because this Court has already determined in its lender liability analysis that plaintiffs have failed to produce sufficient evidence on the issue of control, there is no genuine issue of material fact and defendant is entitled to judgment as a matter of law as to this issue.

### CONCLUSION

After reviewing the arguments presented by both parties and after reviewing the facts and inferences that may be derived therefrom in a light most favorable to the plaintiffs, this Court finds that no genuine issues of material fact exist and defendant is entitled to judgment as a matter of law. Accordingly, judgment shall be issued forthwith.