In re **AMERICAN LUMBER COMPANY,** a Minnesota corporation, **Bankrupt.**

Edward W. **BERGQUIST,** Trust of the bankrupt estate of American Lumber Company, **Plaintiff,**

v.

**FIRST NATIONAL BANK OF ST. PAUL, Defendant.**

**No. 4–79 Civil 407.**

United States District Court, D. Minnesota, Fourth Division.

May 14, 1980.

---

Richard D. Donohoo, Maun, Green, Hayes, Simon, Murray & Johanneson, St. Paul, Minn., for defendant.

RENNER, District Judge.

The defendant First National Bank of St. Paul (hereinafter, the "Bank") appeals the decision of the Bankruptcy Court[1] granting judgment in favor of plaintiff Edward Bergquist, the trustee in bankruptcy of American Lumber Company (hereinafter, the "bankrupt" or "ALC"), finding that the transfers of security interests in inventory and equipment by the bankrupt to the Bank constituted voidable preferences under section 60 of the Bankruptcy Act, 11 U.S.C. § 96, that said transfers were fraudulent under sections 67(d)(2) and (3) of the Act, 11 U.S.C. § 107(d)(2) and (3),[2] that the plaintiff is, therefore, entitled to judgment against the Bank in the amount of $488,744.65 with the Bank's claim being subordinated to the claims of the general unsecured creditors under the doctrine of equitable subordination.

I.

The bankrupt corporation, originally known as U. S. Lumber Company, began operations on January 17, 1975, following its purchase of the operating assets of the old American Lumber Company, a failing Minneapolis, Minnesota, wholesale lumber business. The officers of the new corporation, Paul A. Lilja, Ludwik Kulas and Timothy Peterson, all former employees of the old American Lumber Company, thereupon changed the name of their new company to the American Lumber Company. The purchase was financed by loans totalling $2.5 million dollars from defendant Bank, the primary lender of the old American Lumber Company, under the following documented terms:

(1) The Bank loaned $1 million to a newly created entity called the ALC Employees'

Jan Stuurmans, Stuurmans & Kelly, P.A., Minneapolis, Minn., for plaintiff.

1. The Honorable Kenneth J. Owens, Bankruptcy Judge.

2. The relevant time period for this case preceded the enactment of the 1978 Bankruptcy Code, 11 U.S.C. § 101 *et seq.*; therefore, the prior bankruptcy statute controls and is cited.

Stock Ownership Trust (hereinafter, "ESOT") to be repaid in quarterly installments of $31,250 plus interest. The loan was secured by a pledge of all shares of ALC stock owned by ESOT and a guaranty issued by ALC itself. ESOT was issued 10,000 shares (92 per cent of the outstanding stock) in return for its million dollar contribution to ALC's assets. The remaining 780 shares were purchased by the officers of the new corporation with $80,000 in loans from the Bank. These loans were also secured by pledge of stock.

(2) The Bank made two separate loans to ALC totalling $1.5 million. A $1 million loan was secured by accounts and contract rights, and a $500,000 loan was secured by accounts and contract rights as well as a second mortgage on real estate. Promissory notes on both loans provided for installment payments commencing March 31, 1975.

(3) The entire $2.5 million was used by ALC to purchase the assets and liabilities of the old American Lumber Company. Nearly $2.4 million of that was used by the old American Lumber Company to pay off its debts to the Bank.

(4) In order to generate sufficient funds for ESOT to repay its loan to the Bank, 25 per cent of the officers' salaries were to be contributed to ESOT with the Bank's approval. The aggregate amount of their salaries was, therefore, set at the relatively high level of $300,000 per year.

ALC subsequently purchased lumber, held it in inventory and sold it to residential and commercial builders. However, starting in May 1975 and continuing throughout the summer and fall of that year, losses began showing up on its monthly unaudited financial statements. The September loss was a high of $132,000. In order to meet cash-flow needs, ALC borrowed an additional $100,000 from the Bank on September 19, 1975.

ESOT's April 15 and July 15, 1975 loan installment payments were timely made by ALC. The October 15, 1975 payment was not made, thus placing ESOT in default on its $937,500 principal balance. ALC was also in apparent substantial default under several provisions of its loan agreement with the Bank.

On October 17, 1975 ALC's principals met with bank officers Richard L. Shepley and Dennis K. Dingman and advised them of ALC's default, its acute cash shortage and a "cut-back" proposal designed to improve its financial stability. On October 20, 1975 the Bank began bouncing overdrafts on ALC's general and payroll accounts. The next day, the bank officers and their counsel, Jerome Simon and Charles Bans, met with the ALC principals and their counsel, Leo Stern. Shepley announced that the Bank was calling in all of ALC's loans. Foreclosure of the Bank's security interests was also discussed. Attorney Simon was then informed that the Bank had no security interest on inventory or equipment. Following some discussion, Simon announced that he had an idea whereby the Bank could get such security interests and, in effect, diminish the protection to the general unsecured creditors. ALC had about $400,000 worth of unsecured debt at this time. ALC would not agree to grant the security interest, and no course of action was agreed upon at that time. The Bank was at this time considering the possibility of placing ALC in bankruptcy.

On October 22, 1975 the same ALC and Bank officers met again. Discussion at this meeting centered around the value of ALC's interest in an Indian housing project called Lame Deer, Montana, in which ALC had made a substantial investment and which, if all went well, would result in substantial receivables in the future. No further agreements were reached at this meeting, however, and ALC continued to refuse to execute security agreements on its inventory and equipment.

On October 23, 1975 another meeting was held at which time the Bank told ALC that no further advances would be made, that ALC was, indeed, considered to be in default on its loans, and that all funds in the Bank's custody would be and were being used to offset ALC's obligations to it. The Bank's intentions were put into writing on

October 24, 1975 in the form of a letter from Dingman to Lilja, as president of ALC. ALC conveyed security interests in inventory and equipment to the Bank on the same date. The Bank then began the liquidation of ALC.

The Bank commenced foreclosure on its security interests in accounts receivable and contract rights. It also began receiving and opening all in-coming mail at the ALC office on a daily basis and established a "collateral" or "dominion" account into which all amounts received by ALC were deposited. Dingman was the sole signatory, and the Bank had sole control of the account. At no time thereafter did the Bank relinquish its control over the collection of accounts receivable. All ALC employees were terminated on October 24, 1975. A skeleton crew necessary for an orderly liquidation was rehired on October 31, 1980, upon the Bank's approval and its agreement to honor payroll checks. The Bank also contacted Park Detective Agency, Inc., a security guard service ALC had employed to guard its Minneapolis lumber yard, and employed it to secure the premises.

The Bank began scrutinizing checks presented for payment by ALC payees and made the determinations as to which would be paid. These determinations were based upon whether or not such payment would likely enhance the value of the accounts receivable in which defendant had a perfected security interest. General unsecured creditors were not paid unless such payment would increase the value of an account receivable. Sales taxes were likewise not approved for payment.

From October 24 to December 2, 1975 the Bank advanced $442,000 to ALC. These funds were used either to pay suppliers, materialmen and laborers in connection with the Lame Deer project or other projects where failure to pay would jeopardize the value of accounts receivable, or to pay the personnel conducting the liquidation of ALC. All of these advances were interest-free.

Upon telephone inquiry on October 30, 1975 Dingman advised the American Lumbermen's Credit Association that ALC was not in a bankrupt situation, that current contracts would be fulfilled and that liquidation of ALC would be conducted in an orderly fashion. Upon a second telephone inquiry on November 19, 1975 Dingman again advised the Association that ALC was not insolvent. Dingman represented that the Bank would be liquidating ALC slowly, thereby making it more possible that something would be salvaged for unsecured creditors. The Association disseminated this information.

At the Bank's insistence ALC conducted a physical inventory of its lumber and millwork inventory at its Minneapolis yard on October 28 and 31, 1975. The inventory computed at cost was ascertained to be worth $670,971.38. Expert testimony placed its fair and reasonable value at 15 per cent over cost, or $771,617. Ernst & Ernst was employed by the Bank to oversee the inventorying. On December 9, 1975 a physical inventory was conducted by Dingman and Peterson at the Lame Deer construction site lumber yard. This inventory was assigned a fair and reasonable value of $94,554.

On November 21, the Bank gave notice of foreclosure of its security interests in ALC inventory and equipment. The officers of ALC resigned on December 4, 1975.

On December 5, 1975, the Bank sold some of the ALC Minneapolis inventory, by both bulk and direct sale, for $346,953.88. It sold equipment at an auction sale for $56,941.40 and realized net proceeds of $47,436.77. All proceeds were applied to ALC's indebtedness to the Bank.

## II.

The defendant Bank challenges substantial portions of Judge Owens' findings of fact as being clearly erroneous. With regard to the section 60 voidable preference conclusion, the defendant claims that the Court should have found that: (1) ALC was not insolvent, (2) the transfers were not made to secure an antecedent debt, (3) the transfers did not allow the defendant to

obtain a greater percentage of its debt than other creditors of the same class, and (4) the defendant did not have reasonable cause to believe ALC was insolvent.

With regard to the section 67d(2) fraudulent conveyance conclusion, the Bank challenges the bankruptcy judge's factual findings that (1) ALC was insolvent, (2) the transfers were made without fair consideration, (3) they were part of a design to liquidate ALC, (4) ALC and the Bank knew that the debtor would incur debts which it would not be able to pay, and (5) the transfers were made with the intent to hinder, delay, and defraud existing creditors of ALC.

As to the section 67d(3) fraudulent conveyance conclusion, defendant attacks factual findings that (1) ALC was insolvent, (2) the transfers were fraudulent as to existing and future creditors, (3) the transfers were made in contemplation of the liquidation of ' ALC, (4) the transfers were made with the intention to enable the defendant to obtain a greater portion of ALC's indebtedness to it than other creditors of the same class, and (5) ALC and defendant knew and believed that the ALC and defendant intended to make such use of the consideration.

As to the subordination of its claim, defendant argues that (1) the Bank did not exercise control over all aspects of the finances and operations of ALC, (2) defendant did not have a duty to deal fairly and impartially with ALC and its other unsecured creditors, and (3) defendant did not breach any such duty.

In reviewing these challenged findings, the Court must apply the clearly erroneous standard, giving due regard to the opportunity of the Bankruptcy Court to judge the credibility of the witnesses. R.Bky.P. 810.

### III.

▮ A transfer is preferential under section 60(a) of the Bankruptcy Act when the debtor (1) makes or suffers a transfer of his property, (2) to or for the benefit of a creditor, (3) for or on account of an antecedent debt, (4) when the debtor is insolvent, (5) within four months of bankruptcy, (6) enabling a creditor to obtain a greater percentage of his debt than some other creditor of the same class. A preferential transfer is voidable under section 60(b) if the creditor receiving or to be benefitted by the preference had reasonable cause to believe the debtor was insolvent at the time of the transfer. *Green v. A. G. Edwards & Sons, Inc.,* 582 F.2d 439 (8th Cir. 1978); *Herzog v. Mandan Security Bank,* 574 F.2d 414 (8th Cir. 1978); 3 W. Collier on Bankruptcy ¶ 60.02 at 758–59 (14th Ed. 1976).

The defendant concedes only that the instant transfers occurred within four months of bankruptcy and that they were for the benefit of a creditor.

▮ Judge Owens' finding that the transfer to the Bank of security interests in ALC's inventory and equipment was for or on account of an antecedent debt is well supported by the record. First, the security agreement itself expressly provided that the inventory and equipment were to secure all notes not just future or contemporaneous ones. Second, and most basically, none of the $443,000 advanced after execution of the security agreement was advanced for the benefit of ALC. The record abounds with evidence supporting the court's finding that all funds were advanced for the purpose of preserving and increasing the amount to be recovered by the Bank at the expense of the general unsecured creditors. For example, the interest-free "loans" were made after, and partially because, the Bank had already foreclosed on ALC's primary source of operating capital, accounts receivable, which would have provided the same amount of cash as the loans did. Clearly, those loans were a sham and provided insufficient consideration to support a security interest.

▮ The Bank's claim that ALC was not insolvent on October 24, 1975 is also meritless. It is undisputed that the $1 million loan obligation of ESOT was in default as of October 15, 1975 and that ALC was a guarantor. Competent expert testimony of ALC officers Kulas and Peterson supported the court's findings that the value of

ESOT's ALC stock was zero and that ALC's liability as guarantor on the note was unconditional and should have been included as a liability of ALC. Under such circumstances, the amount of debt guaranteed is properly included as a liability of the guarantor. *Schwartz v. Commissioner of Internal Revenue*, 560 F.2d 311, 317 (8th Cir. 1978); *Huttig Mfg. Co. v. Edwards*, 160 F. 619, 621 (8th Cir. 1908). The competent and essentially uncontradicted expert testimony of Kulas and Peterson also supported the court's determination of the fair market value of ALC's assets and its ultimate findings that ALC's liabilities exceeded its assets by $776,500 on October 24, 1975.

To now say that the transfers did not result in the defendant obtaining a greater percentage of its debt than other creditors of the same class diminishes the Bank's credibility. ALC's inventory alone was worth $771,000 on October 24, 1975. Uncommitted, it provided the only fund for general unsecured creditors for security interests had been given in all of ALC's remaining assets. The Bank's foreclosure of that security interest and application of the sale of equipment and inventory to ALC's debt obligation left creditors who were entitled to a *pro rata* share of that fund with nothing. Plainly, this element of the test for a voidable preference has been satisfied.

Defendant finally contends that it did not have reasonable cause to believe that ALC was insolvent when the transfer occurred. The evidence, however, firmly supports the bankruptcy court's conclusion to the contrary. On October 24, 1975, the Bank knew that ALC was in default on its loan obligations to it. It knew that its losses were mounting. It knew that ALC was in an overdraft situation in both its payroll and checking accounts. It knew that ALC's accounts receivable had been foreclosed upon. And it knew that ESOT had defaulted on its loan, that ESOT assets were virtually nil and that ALC now had $937,500 of additional liability. Indeed, it knew enough that it became convinced that it had to do everything possible to maximize the security on its loans and remove ALC's inventory and equipment from the general pot. It knew enough to embark on a liquidation plan obviously geared toward that goal, regardless of whether the general creditors would be harmed. Not only is Judge Owens' finding of reasonable cause not clearly erroneous, it is so well supported by the record that the Court would be hard pressed to affirm a finding to the contrary.

The bankruptcy court's conclusion that the transfers constituted voidable preferences must, therefore, be sustained.

## IV.

Section 67(d)(2) of the Bankruptcy Act invalidates as fraudulent any transfer made and every obligation incurred within one year to the filing of a bankruptcy petition if the transfer was made or the obligation was incurred without fair consideration and (a) the transferor was insolvent at the time or was thereby rendered insolvent, (b) the transferor continued the business after the transfer without a reasonable amount of capital to continue the business, or (c) the transferor intended to incur or believed that it would incur debts beyond its ability to pay as the debts matured. Actual intent need not be shown.

Defendant concedes that the transfers occurred within one year of the filing of the bankruptcy petition, but disputes the findings leading to the court's conclusion that the transfers were fraudulent within the ambit of section 67(d)(2). The challenge is not well grounded.

Section 67(d)(1)(e) defines "fair consideration" as follows:

"Consideration given for the property or obligation of a debtor is 'fair' (1) when, in good faith, in exchange and as a fair equivalent therefor, property is transferred or an antecedent debt is satisfied, or (2) when such property or obligation is received in good faith to secure a present advance or antecedent debt in an amount not disproportionately small as compared with the value of the property or obligation [incurred.]"

■ Thus, "good faith" becomes a key to a determination that the consideration given was fair. A transaction is not done in good faith if the earmarks of an arms-length transaction are missing. *Bullard v. Aluminum Co. of America*, 468 F.2d 11, 13 (7th Cir. 1972).

■ In the instant case, the bankruptcy court found that the transaction was a sham because of the Bank's absolute control over ALC, its knowing encumbrance of the only assets with which ALC could continue operations thereby making the "loans" necessary, and the facts that the Bank was the sole beneficiary of the transfers, the general creditors no longer being compensated out of ALC's inventory and ALC itself receiving no benefit whatsoever. Under such circumstances, the bankruptcy court did not err in finding that the transfers were not made in good faith and that fair consideration was not given for the security interests in inventory and equipment.

■ Since the Court has already accepted Judge Owens' finding that ALC was insolvent at the time of the transfer, the elements of a fraudulent conveyance are present, and the Court must affirm the conclusion that the transfers were fraudulent under section 67(d)(2). While, in light of this, it is unnecessary to reach the alternative elements of proof, the Court nevertheless notes that there is also evidence in the record sufficient to support further findings that the transfers were part of a design to liquidate ALC, that ALC and the Bank knew that the debtor would incur debts which it would not be able to pay, and that the transfers were made with the intent to hinder, delay, and defraud existing creditors of ALC.

### V.

■ Defendant next objects to the bankruptcy court's conclusions that the transfers were fraudulent under section 67(d)(3) of the Act. Under this section every transfer made and every obligation incurred by a debtor who is or will thereby be rendered insolvent within four months prior to the filing of a petition for bankruptcy is a fraud as to existing or future creditors (1) if such transfers were made in contemplation of bankruptcy or liquidation of all or most of its property with the intent to use the consideration obtained to enable a creditor of the debtor to obtain a greater percentage of his debt than another creditor of the same class and (2) if the transferee knew at the time or believed that the debtor intended to make such use of the consideration.

■ The solvency issue having been resolved, and the fact that less than four months elapsed between the transfer having been admitted, the Court finds that the remaining factual issues have in essence, if not in particular, been resolved as well. There can be no doubt that the transfers were made in contemplation of ALC's liquidation. The Bank was, in fact, in the process of executing its plan for liquidating ALC at the time the transfer was made. Since the transfer was made in an effort to maximize its recovery, there can likewise be no doubt that the transfer was made with the intent to obtain a greater portion of ALC's indebtedness to it. Finally, since defendant was in control of the liquidation, its knowledge that the loans were being used to maximize its own recovery to the detriment of the general creditors cannot be seriously questioned.

Thus, it is clear that the transfers were fraudulent as to existing and future creditors within the meaning of section 67(d)(3).

### VI.

The bankruptcy court specifically found that because of the Bank's control over ALC's operations, it had a duty to deal fairly and impartially with ALC and its other unsecured creditors. It found that the Bank breached its duty by "undertaking a course of liquidation that was designed solely to preempt from general unsecured creditors any portion of the value of the inventory and equipment of ALC and to thereby enhance the value of defendant's previously existing security interest in the accounts receivable and contract rights of ALC." Conclusions of Law No. 22. It fur-

ther found that equity required the subordination of the Bank's claim under the circumstances.

■ The Bank does not dispute the bankruptcy court's power to subordinate claims "to prevent the consummation of a course of conduct by a claimant which would be fraudulent or otherwise inequitable." *Heiser v. Woodruff*, 327 U.S. 726, 733, 66 S.Ct. 853, 856, 90 L.Ed. 970 (1946). *See also Pepper v. Litton*, 308 U.S. 295, 304–05, 60 S.Ct. 238, 244, 84 L.Ed. 281 (1939). Bankruptcy courts are traditionally courts of equity, and their equitable powers of subordination were not eliminated by the enactment of Rule 37, R.Bky.P., in 1976. *In the Matter of Mobil Steel Co.*, 563 F.2d 692, 699 (5th Cir. 1977). Indeed, by enacting section 510(c) of the Bankruptcy Reform Act, effective October 1, 1979, 11 U.S.C. § 510(c), Congress expressly reaffirmed the power of equitable subordination.

■ Before invoking the power, however, three conditions must be present: (1) The claimant must have engaged in some type of inequitable conduct; (2) the misconduct must have resulted in injury to the creditors of the bankrupt or conferred an unfair advantage on the claimant; and (3) equitable subordination of the claim must not be inconsistent with the provisions of the Bankruptcy Act. *In the Matter of Mobil Steel Co., supra* at 699–700.

■ In the case at hand, it was the Bank's use of its control over ALC's operations in a manner detrimental to the unsecured creditors which constitutes the inequitable conduct. The purposeful exercise of that control to implement its plan is amply demonstrated, not merely by Attorney Simon's comments as to the plan he had to disadvantage the general creditors by taking security interests in inventory and equipment, but also by the Bank's actions in following through with conduct designed to obtain for the Bank a greater percentage of the debt owed to it by ALC than owed to other general creditors.

The evidence of the Bank's control over ALC operations and its inequitable exercise of that control is overwhelming: First, the Bank had the right to controlling interest in the stock of ALC after ESOT defaulted on its loan obligations to the Bank. Second, since the Bank was ALC's sole source of credit, its decision not to honor ALC payroll checks clearly placed ALC within the coercive power of the Bank. Its foreclosure of its security interests in accounts receivable and contract rights deprived ALC of the only source of ready cash with which to conduct its business. "Loans" were thereafter necessary for every expenditure. Third, the Bank forced full compliance with its wishes by stern measures. It forced the termination of all employees allowing only those necessary for liquidation to be rehired. It contracted with security guards to watch over the lumber yard. It cut the corporate officers' salaries to one-sixth their original amount. It forced ALC to execute security agreements on its only remaining assets, later telling one ALC officer that he could quit if he disapproved of the Bank's conduct. Finally, it determined which of ALC's creditors would be paid and made sure that the only accounts paid were those which it felt would enhance its position.

The injury which occurred to ALC's general unsecured creditors is obvious. Not only did the Bank refuse to pay them after October 24, 1975, it subsequently received the $488,744.65 worth of proceeds from sales of ALC's inventory and equipment which would otherwise have been available for payment to them.

Subordination of the Bank's claim is not inconsistent with the provisions of the Bankruptcy Act. Indeed, failure to subordinate in this case would be contrary to its goals. While defendant argues that subordination will cause members of the financial community to feel that they cannot give financial assistance to failing companies, but must instead foreclose on their security interests and collect debts swiftly, not leaving any chance for survival, the Court is singularly unimpressed.

What the Bank did was not an attempt to save ALC from failure, or even to legiti-

mately cover its own losses. It sought to perpetuate a fraud upon the general unsecured creditors of ALC. This kind of conduct cannot be allowed to prevail.

The Court can think of few cases where application of the doctrine of equitable subordination is more appropriate.

For the foregoing reasons, the judgment is in all respects affirmed.