SCHWAN'S SALES ENTERPRISES, INC. a/k/a Schwan's Consumer Brands, N.A./Freschetta, Plaintiff,

v.

COMMERCE BANK & TRUST COMPANY, Defendant.

No. 02–40232–FDS.

United States District Court, D. Massachusetts.

Sept. 20, 2005.

Gordon J. MacDonald, Nixon & Peabody, LLP, Manchester, MA, Kevin M. Fitzgerald, W. Scott O'Connell, Nixon Peabody, LLP, Manchester, NH, Monica L. Clark, Dorsey & Whitney, LLP, Minneapolis, MN, for Plaintiff.

Robert L. Hamer, Kristin D. Thompson, Mirick, O'Connell, Demallie & Lougee, LLP, Worcester, MA, for Defendant.

### MEMORANDUM AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

SAYLOR, District Judge.

This is a lender-liability action arising out of the failure of a marketing firm called Good Stuff Entertainment Corporation. Plaintiff Schwan's Sales Enterprises, Inc., a producer of frozen pizza and other products, paid advances to Good Stuff for future marketing services. Defendant Commerce Bank & Trust Company was a creditor of Good Stuff that obtained a perfected security interest in the accounts receivable and other assets of the company, including any advances. As Good Stuff began to fail, the advances paid by Schwan's were used to pay down the credit line advanced to the company by the bank, rather than set aside or used for marketing services, as anticipated by Schwan's. Good Stuff eventually went bankrupt without fulfilling its obligation to perform marketing services, leaving Schwan's as an unsecured creditor of the bankruptcy estate.

Schwan's alleges, under a variety of legal theories, that the bank exerted undue control over Good Stuff to its detriment. Pending before the Court is Commerce Bank's motion for summary judgment pursuant to Fed.R.Civ.P. 56(b). For the reasons set forth below, the motion will be granted.

### I. Background

The facts, which are largely undisputed, are set forth below in the light most favorable to the plaintiff.

### A. The Parties

Schwan's is a Minnesota corporation with its principal place of business in Marshall, Minnesota. Schwan's produces and distributes a variety of frozen foods and

other food products, including Freschetta and Tony's brand frozen pizza.

Good Stuff was a New Hampshire-based marketing company that conducted nationwide special events and corporate sponsorships for various clients. Michael Kelly was Good Stuff's founder and president.

Commerce Bank is a Massachusetts bank and trust company with its principal place of business in Worcester, Massachusetts. Roger Allard was the loan officer of the bank who was in charge of the lending relationship with Good Stuff.

## B. *The Loan Agreement Between Good Stuff and the Bank*

On October 10, 2001, Good Stuff entered into a loan agreement with the bank pursuant to which the bank advanced $520,000 to Good Stuff as a term loan.[1] The parties also entered into a $1,000,000 revolving loan facility (the "Agreement"). As part of the Agreement, Good Stuff executed and delivered to the bank a revolving note dated October 10, 2001 (the "Revolving Note"). The Revolving Note incorporated by reference all of the terms and conditions of the Agreement and provided that Good Stuff could "borrow, repay and reborrow the principal" under the Revolving Note "through and including the earlier of October 8, 2003 or the occurrence of a Default or Event of Default under the Agreement," up to the lesser of $1,000,000 or the "Borrowing Base," as defined in the Agreement. The Borrowing Base was defined as 80% of the unpaid amount of "Qualified Accounts," as defined in the Agreement, plus 60% of "Qualified Prebilled Accounts," as defined in the Agreement. Thus, the maximum amount of money that Good Stuff could borrow at any given time was limited by the collateral available to support repayment of the loan. But, at the same time, Good Stuff was able to enjoy the proceeds of its prebilled accounts before they were paid by its customers—and potentially long before Good Stuff performed services for those customers.

Pursuant to the Agreement, the amount of the Borrowing Base was to be determined based upon Borrowing Base Certificates and copies of customer contracts supporting prebilled accounts, all submitted by Good Stuff, as well as records maintained by the bank regarding the assets supporting the loan, cash receipts applied to the loan, and advances made under the loan. The revolving loan portion of the Agreement between Good Stuff and the bank was structured under a "lockbox" arrangement, where all payments to Good Stuff for either accounts or prebilled accounts were forwarded to a mailbox controlled by the bank. Under its Agreement with Good Stuff, the bank would deposit all such receipts to an account controlled by the bank for 48 hours, after which the funds were credited to the balance due under the Revolving Note or, if that loan were completely paid, to Good Stuff's operating account. When checks were presented on Good Stuff's operating account, the bank would increase Good Stuff's revolving loan by transferring the funds necessary to honor such checks to the operating account. Under this arrangement, Good Stuff would carry the smallest possible balance under its revolving loan with the bank, but Good Stuff would not have access to any cash from the bank except through advances under the Revolving Note.

---

1. The mechanics of the loan agreement between Good Stuff and the bank were ably described by the bankruptcy judge in his memorandum opinion of July 23, 2002, in *In re Good Stuff Entertainment Corporation*, Adv. No. 02–1108–JMD. The Court has incorporated that description largely verbatim.

As consideration for its advance of funds under the Agreement, Good Stuff granted the bank a security interest in, pledged, and assigned to the bank substantially all of its assets, including accounts (which, as explained, were paid directly to a lockbox maintained for the benefit of the bank). On October 10, 2001, the bank filed a Uniform Commercial Code (UCC) financing statement with the New Hampshire Secretary of State that covered "[a]ll assets now owned or hereafter acquired wherever located," including accounts, as specified in Schedule A attached to the financing statement.

## C. The Services Contract between Good Stuff and Schwan's

As noted, Schwan's produces Freschetta brand frozen pizza. On December 17, 2001, Good Stuff entered into a Services Contract with Schwan's in which it agreed to develop, execute, and manage the "Freschetta 2002 Mobile Marketing Tour." The tour contemplated a nationwide series of 320 events over a period of at least four months, involving six Freschetta buses and a minimum distribution of approximately 550,000 Freschetta pizza samples. The tour apparently was scheduled to take place in the summer of 2002.

Pursuant to the terms of the Services Contract, Schwan's agreed to pay amounts invoiced by Good Stuff in advance of services rendered. Under the payment terms, $350,000 was due on December 31, 2001; $175,300 was due on March 31, 2002; and $175,300 was due on June 15, 2002. The Services Contract did not require that the advances be placed in escrow or in trust, or that Good Stuff otherwise segre-

gate the funds in any way. Schwan's did not take a security interest of any kind in the assets of Good Stuff.

## D. Good Stuff's Default on the Loan and Subsequent Events

On December 21, 2001—only four days after the Services Contract was executed between Schwan's and Good Stuff—the bank declared Good Stuff in default of the Agreement. It is unclear precisely what transpired over the next few weeks; according to the answer filed by the bank, the bank accelerated all of Good Stuff's obligations under the Agreement.

In the meantime, pursuant to the Services Contract, Good Stuff issued invoices to Schwan's, and Schwan's made advance payments to Good Stuff. Schwan's prepaid Good Stuff more than $736,075 in the following installments: $150,000 by check dated February 13, 2002; $150,000 by check dated February 26, 2002; $150,000 by check dated March 29, 2002; $34,875 by check dated April 23, 2002; $101,200 by check dated May 13, 2002; and $150,000 by check dated June 4, 2002.

Between January 10, 2002, and April 23, 2002, Good Stuff submitted Borrowing Base Certificates to the bank certifying that it had issued invoices to Schwan's totaling $701,200, the total amount of the Services Contract.[2] Pursuant to the Agreement—and despite the fact that Good Stuff had been in default since December 21, 2001—the bank made available and advanced 60% of each such invoice to Good Stuff in the following installments: on January 10, 2002, $210,360; on January

---

2. The Services Contract contemplated payments totaling $700,600; Schwan's made payments totaling $736,075. The reason for the discrepancy, which is not apparent from the record, is immaterial for present purposes. The discrepancy between the total of

the Borrowing Base Certificates ($701,200) and the payments ($736,075) apparently relates in some way to the $34,875 payment made by Schwan's on April 23, 2002; again, the reason is immaterial for these purposes.

31, 2002, $59,640; on March 4, 2002, $90,000; and on April 23, 2002, $60,720; for a total of $420,720.

From December 2001 through June 2002, the bank, through Allard, actively encouraged Good Stuff to collect funds from Schwan's. Kelly testified, however, that the bank never directed Good Stuff to accelerate its collections of prepayments from Schwan's.

During this period, the bank was involved somewhat in Good Stuff's affairs, apart from administering the loan and encouraging Good Stuff to collect prepayments from its customers. Through Allard, the bank directed Good Stuff to extend the employment of a consultant acting as the chief financial officer, Charles Newdorf. In December 2001, the bank refused to honor company-issued checks, including employee expense checks, except one for Newdorf. Later, Allard directed Good Stuff to fire Newdorf and to hire Michael Bolus as his replacement. Allard corresponded with Good Stuff regarding which bills would be paid and when. Allard also spoke with Good Stuff's comptroller directly on occasion.

By the late spring of 2002, the bank had begun to increase the pressure on Good Stuff to get back "in formula" under the Agreement. In an e-mail to Good Stuff dated April 25, 2002, Allard advised Good Stuff with respect to its account receivables: "Looks like I have to baby sit you guys again and lay the law down. The answers are very simple, either collect the AR or slow down payables."

The bank became particularly focused on outstanding prepayments Good Stuff could collect from its customers, including $150,000 that would be due from Schwan's on June 15 under the Services Contract.[3] On May 31, 2002, Allard demanded assurances from Kelly that the payments would come in; apparently, Allard did not believe that the invoices Good Stuff had presented for the Schwan's account were accurate. Allard told Kelly that if the prepayments did not come in he was prepared to "choke the company."[4] Kelly believed that the $150,000 from Schwan's would be available for operations. Indeed, in an email dated June 6, 2002, Allard told Kelly that the "Freschetta $150,000 when received is 100% for the company's usage."[5] At the time, Allard was aware that Good Stuff still had an obligation to perform under the Services Contract. According to Allard, the bank's goal at the time was to enter a forbearance agreement that would keep Good Stuff running long enough for it to find another lender to replace the bank.

According to Schwan's, the bank "seized" the last installment of $150,000 from Schwan's and applied it against the outstanding loan. Within two weeks after the final payment by Schwan's, the bank froze Good Stuff's credit lines, and the company found itself without enough cash flow to continue operations. On July 9, 2002, Good Stuff filed a Chapter 11 bank-

3. The record does not appear to reflect why the amount owed ($150,000) differed from the payment contemplated under the terms of the contract ($175,300).

4. Allard testified with respect to the June 2002 Schwan's prepayment: "The reason why that was so relevant is because that was going to put them out of formula under the line of credit, and as a result of being out of formula, they were going to be in an absolute-

ly upside down no-win situation if they didn't get the cash flow in here. They didn't have collateral availability to support their level of operation."

5. Allard's June 6, 2002 e-mail also contained the following disclaimer: "The Bank still reserves its rights and remedies existing under the Loan and Security Agreement to exercise any and all action necessary to protect our outstanding loans to the Company."

ruptcy petition in the United States Bankruptcy Court for the District of New Hampshire.

Kelly testified that, had Good Stuff known that the bank was simply going to apply the prepayments from Schwan's to the loan, he would not have asked Schwan's for the June 2002 prepayment. According to Schwan's, the effect of the bank's conduct was to render Good Stuff unable to perform its obligations under the Services Contract. The bank never communicated with Schwan's regarding Good Stuff's financial difficulties or any plan to apply Schwan's prepayments to the Good Stuff loan.

On November 26, 2002, Schwan's filed the present action against the bank, alleging (1) conversion and/or misappropriation, (2) tortious interference with contract, (3) breach of fiduciary duty, and (4) instrumentality and agency theories of lender liability based on this Court's diversity jurisdiction. On the bank's motion, Schwan's claim for conversion was dismissed by order of this Court dated September 12, 2003.

## II. *Analysis*

### A. *Standard of Review*

The role of summary judgment is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.*, 895 F.2d 46, 50 (1st Cir.1990)). The burden is upon the moving party to show, based upon the pleadings, discovery, and affidavits, "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Once the moving party has satisfied its burden, the burden shifts to the non-moving party to set forth specific facts showing that there is a genuine, triable issue. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The court must view the entire record in the light most hospitable to the non-moving party and indulge all reasonable inferences in that party's favor. *O'Connor v. Steeves*, 994 F.2d 905, 907 (1st Cir.1993).

### B. *The Claims for Breach of Fiduciary Duty and Instrumentality*

Schwan's asserts two different theories of lender liability against the bank: breach of fiduciary duty and liability under an instrumentality theory. In Count 3, Schwan's claims that the bank, by virtue of its "complete control" over Good Stuff, assumed a fiduciary relationship with Good Stuff's creditors, including Schwan's, and, by misappropriating the prepayments made to Good Stuff, the bank breached that fiduciary obligation. *See, e.g., In re American Lumber Co.*, 5 B.R. 470, 477–79 (D.Minn.1980). In Count 4, Schwan's alleges that the bank is liable for its damages under the "instrumentality" theory of lender liability, according to which a creditor is responsible for the obligations of its debtor when the creditor treats the debtor " 'as a mere business conduit for the purposes of the dominant corporation.' " *See, e.g., Healy v. Mcghan Med. Corp.*, No. CA975320, 2001 WL 717110, *6 (Mass.Super. March 29, 2001) (quoting *F.C. Imports, Inc. v. First Nat'l Bank of Boston*, 816 F.Supp. 78, 91 (D.P.R.1993)). Although each theory requires distinct proof, both turn to a large extent on the degree of actual control the bank exercised over Good Stuff's operations. If the bank did not exercise the requisite degree of control, then it cannot be liable either for breach of fiduciary duty or under the instrumentality theory.

■ The law generally protects commercial lenders from liability for the debts of their borrowers. "[A]s a general rule lenders are not fiduciaries when it comes to collection on their claims." *In re 604 Columbus Ave. Realty Trust,* 968 F.2d 1332, 1361 n. 25 (1st Cir.1992) (internal quotation omitted); *see also F.C. Imports,* 816 F.Supp. at 91 ("Lenders have traditionally been held to have no duty to third parties dealing with their borrower."). To determine whether the bank exerted sufficient control over Good Stuff to support liability, the Court must consider "the sum of [the bank's] conduct with respect to [Good Stuff], total up all the indicia of control, and determine whether the cumulative conduct has tipped the scales." *In re Beverages Int'l Ltd.,* 50 B.R. 273, 282 (Bkrtcy.D.Mass.1985). Schwan's must show that the bank "assumed actual, participatory, total control of" Good Stuff. *F.C. Imports,* 816 F.Supp. at 92. The leverage the bank may have had as a practical consequence of the lending relationship itself is not dispositive, because it is not "the exercise of such total control over the debtor as to have essentially replaced its decision-making capacity with that of the lender." In re *Clark Pipe & Supply Co.,* 893 F.2d 693, 701 (5th Cir.1990).

Schwan's contends that Good Stuff was under the total control of the bank in its business operations. Specifically, it contends that (1) the bank had "absolute dominion and control" over all of Good Stuff's accounts by virtue of the lockbox arrangement; (2) had discretion whether to apply lockbox receipts to pay down the loan balance, making it "the sole source of funds to operate Good Stuff"; (3) directed Good Stuff to seek prepayment for services; (4) insisted that if prepayment checks did not come in it would "choke the company"; (5) failed to make funds available for Good Stuff to perform its obligations to Schwan's, as promised; (6) by "seizing and applying" the Schwan's payment against the loan, rendered Good Stuff unable to perform its obligations to Schwan's; (7) refused to honor company-issued checks, including employee expense checks; (8) determined which of Good Stuff's creditors would be paid and when; (9) directed Good Stuff concerning hiring and firing decisions; and (10) contacted Good Stuff's controller directly. The question is whether that evidence, if credited, is sufficient to establish that the bank exerted sufficient control over Good Stuff such that the bank assumed fiduciary obligations to the company and its unsecured creditors (and treated the debtor as a "mere business conduit" within the meaning of the instrumentality theory).

The facts here are analogous to those presented to the United States Court of Appeals for the Fifth Circuit in *Clark Pipe,* 893 F.2d at 695. *Clark Pipe* involved a similar asset-based financing arrangement between the lender, Associates, and the debtor, Clark Pipe and Supply. As recounted by the court:

> In September 1980, Associates and Clark executed various agreements under which Associates would make revolving loans secured by an assignment of accounts receivable and an inventory mortgage. Under the agreements, Clark was required to deposit all collections from the accounts receivable in a bank account belonging to Associates. The amount that Associates would lend was determined by a formula, i.e., a certain percentage of the cost of inventory. The agreements provided that Associates could reduce the percentage advance rates at any time at its discretion.

*Id.* Months later, Clark's business began to slump, and Associates took steps to protect itself:

In February 1982 Associates began reducing the percentage advance rates so that Clark would have just enough cash to pay its direct operating expenses. Clark used the advances to keep its doors open and to sell inventory, the proceeds of which were to pay off the past advances from Associates. Associates did not expressly dictate to Clark which bills to pay. Neither did it direct Clark not to pay vendors or threaten Clark with a cut-off of advances if it did pay vendors. But Clark had no funds left over from the advances to pay vendors or other creditors whose services were not essential to keeping its doors open.

*Id.* .

Clark eventually sought protection under the Bankruptcy Code. *Id.* at 696. The bankruptcy court concluded that Associates asserted total control and used Clark as an instrumentality to liquidate Associates' unpaid loans; accordingly, it equitably subordinated Associates' claims. *Id.* at 699. The Fifth Circuit reversed, concluding that "Associates was not a fiduciary of Clark, it did not exert improper control over Clark's financial affairs, and it did not act inequitably in exercising its rights under its loan agreement with Clark." *Id.* at 702. The court emphasized that all of the actions Associates took to protect its own position were expressly authorized by the loan agreement. *Id.* at 700. Thus, the court observed, "Associates had the right to reduce funding, just as it did, as Clark's sales slowed." *Id.* There was no question that Associates intended through its actions to put itself in the best position it could prior to bankruptcy, *id.*, but the Court found that motive to be irrelevant because Associates' conduct was not inconsistent with the loan agreement. *Id.* at 701.

■ As in *Clark Pipe*, there is no question but that the bank here asserted an enormous amount of practical control over Good Stuff's finances by virtue of the asset-based lending arrangement. Schwan's, however, has presented no evidence that the bank failed to comply with the terms of the Agreement in any respect. Courts have consistently held that a lender does not assume the requisite degree of control over its borrower simply by making advances and reducing funding in accordance with the terms of a loan agreement—even when the loan administration is "admittedly powerful and ultimately severe." *E.g., id.* at 700–02 ("Through its loan agreement, every lender effectively exercises 'control' over its borrower to some degree."); *accord Great West Cas. Co. v. Travelers Indem. Co.,* 925 F.Supp. 1455, 1465–67 (D.S.D.1996); *F.C. Imports,* 816 F.Supp. at 92–93. Schwan's has not presented any evidence to suggest that the loan documents were negotiated at anything other than arm's length or that they were atypical of loan documents used in similar asset-based financing arrangements. *See Clark Pipe,* 893 F.2d at 700; *Great West,* 925 F.Supp. at 1466.

Schwan's contends that the bank improperly insisted that if prepayment checks, including one from Schwan's, did not come in it would "choke the company." But under the Agreement, Good Stuff used the Schwan's prepayments as collateral to support its further borrowing; ultimately, Good Stuff's ability to continue operations and perform for its clients depended upon its collection of prepayments.

Schwan's also takes issue with the bank's failure to make funds available for Good Stuff to perform its obligations to Schwan's and its "seizing and applying" the Schwan's prepayment against the loan. The bank had no duty to make gratuitous advances to Good Stuff outside of those for

which the Agreement provided—in this case, those for which Good Stuff had amassed the required collateral. *See Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting,* 908 F.2d 1351, 1356 (7th Cir. 1990) ("[W]e are not willing to embrace a rule that requires participants in commercial transactions not only to keep their contracts but also do 'more'—just how much more resting in the discretion of a bankruptcy judge assessing the situation years later."), *quoted in In re 604 Columbus Ave.,* 968 F.2d at 1362; *In re Teltronics Servs., Inc.,* 29 B.R. 139, 170 (Bkrtcy. E.D.N.Y.1983) ("[A] creditor normally has an unqualified right to call a loan when due, to refuse to extend a loan for any cause or no cause at all, and to lawfully enforce collection.").

Schwan's also points to other conduct, not specifically authorized by the Agreement, that tends to prove that the bank exercised undue control. First, Schwan's contends that the bank determined which creditors would be paid. The record evidence, however, does not support that conclusion. Schwan's relies on the following exchange from the Kelly deposition:

> Counsel: "In the spring and early summer of 2002, when [*sic*] Mr. Allard was corresponding by email and by telephone with at first Mr. Newdorf and later you concerning what bills would be paid and what payments were expected; wasn't he?"
>
> Kelly: "Yes."

"Corresponding" with Newdorf · or Kelly "concerning what bills would be paid" is not the same as determining what bills should be paid, and is not the exercise of undue control. Certainly the bank had the right to monitor its collateral; "[m]onitoring operations and proffering advice to a debtor, even when coupled with a decision to withhold credit," is not exercising control. *In re Beverages,* 50 B.R. at 282;

*accord In re Teltronics,* 29 B.R. at 172 ("There is nothing inherently wrong with a creditor carefully monitoring his debtor's financial situation or with suggesting what courses of action the debtor ought to follow."). In any event, there is no evidence that the bank improved its position to the detriment of Schwan's by any election to pay certain creditors.

Second, Schwan's contends that the bank refused to honor certain company-issued checks, including expense checks. There is no evidence, however, that at the time of presentment of the referenced checks, the debtor was entitled to further advances to cover them under the terms of the Agreement. Again, practical control over the debtor's finances is not control over its operations. *Clark Pipe,* 893 F.2d at 702. Similarly, even if the bank on one occasion advanced funds to cover the payment of a check to Newdorf, there is no suggestion of any connection between the bank's doing so and the exercise of any control over the debtor's operations. There is no evidence that the bank exerted undue influence over Newdorf in whatever role he took in Good Stuff's operations.

Third, Schwan's points out that there is evidence that the Bank directed the hiring and firing of Newdorf as Good Stuff's chief financial officer and the hiring of Michael Bolus to replace him. As noted above, however, there is no evidence that the bank controlled or acted through Newdorf. As for Bolus, the record cited by the plaintiff actually reflects the opposite: in the face of the bank's urging to wind the company down, Bolus joined Kelly in opposing the bank's recommendation.

The bank here exercised significantly less control over the activities of Good Stuff than did the lenders in *In re Beverages* and *American Lumber,* relied upon by Schwan's. There is no evidence that the bank owned any stock of Good Stuff, attended any shareholder meetings, voted

or attempted to vote any stock of Good Stuff, or had any employees as directors or officers of Good Stuff. *See In re Beverages,* 50 B.R. at 283; *American Lumber,* 5 B.R. at 478. As discussed above, the bank did not make management decisions for Good Stuff, such as actually deciding (as opposed to corresponding about) which creditors to prefer with the diminishing amount of funds available. *See American Lumber,* 5 B.R. at 478. The bank did not expressly dictate to Good Stuff which bills to pay, nor did it direct Good Stuff not to pay vendors. Unlike the lender in *American Lumber,* the bank did not mislead Schwan's or any other creditor to continue making payments to Good Stuff. *See id.* at 474. Most importantly, there is no evidence that the bank controlled the manner in which Good Stuff spent the sums the bank advanced to Good Stuff under the Agreement.

The bank's control over Good Stuff's finances, "admittedly powerful and ultimately severe," was based on the exercise of its powers under the Agreement. *Clark Pipe,* 893 F.2d at 702. The fact that it maintained a close watch over Good Stuff's affairs does not alone amount to improper control. *See Great West,* 925 F.Supp. at 1467. At all times Good Stuff had the power to act autonomously and, if it chose, to disregard the bank's advice. As its finances deteriorated, and additional credit was withheld by the Bank within the terms of the Agreement, the number and scope of its options naturally diminished, but Good Stuff remained in exclusive control of its day-to-day operational decisions, limited by its deteriorating financial means. Accordingly, there is no basis for liability under the instrumentality theory or for breach of fiduciary duty.

### C. *The Claim for Tortious Interference with Contractual Relations*

Schwan's also alleges that the bank tortiously interfered with its contractual relations with Good Stuff by intentionally causing Good Stuff to breach the Services Contract. There are four elements required to establish tortious interference: (1) that the plaintiff had a contract with a third party; (2) that the defendant knowingly induced the third party to break that contract; (3) that the defendant's interference was intentional and improper in motive or means; and (4) that the plaintiff was harmed by the defendant's actions. *Draghetti v. Chmielewski,* 416 Mass. 808, 816, 626 N.E.2d 862 (1994). *See also* Restatement (Second) of Torts § 766 (1979) and comments thereto; *United Truck Leasing Corp. v. Geltman,* 406 Mass. 811, 816, 551 N.E.2d 20 (citing Restatement (Second) of Torts § 766); *Tech Plus, Inc. v. Ansel,* 59 Mass.App.Ct. 12, 793 N.E.2d 1256 (2003) (same).

It is undisputed that Schwan's entered into a contract with Good Stuff; that Good Stuff breached the contract; and that Schwan's suffered substantial financial harm as a result of the failure to perform. The issue thus is whether the bank knowingly induced Good Stuff to breach its contract with Schwan's, and whether that interference was intentional and improper in motive and means.

### 1. *Knowing Inducement*

A precise definition of the element of "knowing inducement" is not provided by Massachusetts case law. According to the Restatement (Second) of Torts, the word " 'inducing' refers to the situations in which [the defendant] causes [the third party who is in breach] to choose one course of conduct rather than another," and includes "any intentional causation whether by inducement or otherwise." Restatement (Second) of Torts § 766, cmt. h (1979).

A recent decision of the Second Circuit analyzes the concept in relation to facts analogous to those found here. *In re Sharp Int'l Corp.*, 403 F.3d 43, 47 (2d Cir.2005), involved a lending relationship between Sharp and State Street Bank. Sharp began borrowing from State Street in 1996, when the bank approved a $20 million demand line of credit secured by Sharp's assets. *Id.* In 1998, State Street began to suspect that there was ongoing fraud at Sharp. *Id.* At the time, Sharp was current in its loan payments and well within its credit-line limits. *Id.* Nevertheless, State Street began to take precautionary measures to protect itself from Sharp's potential financial decline. *Id.*

After State Street confirmed fraudulent practices by the principals of Sharp, the bank "arranged quietly for the [principals] to repay the State Street loan from the proceeds of new loans from unsuspecting lenders." *Id.* Sharp approached a group of investors for an additional $25 million in financing, $10 million more than Sharp owed to State Street. *Id.* at 48. "While that transaction went forward, State Street gave no warnings and blew no whistles, ignored inquiring calls from the [n]oteholders, preserved Sharp's line of credit when it had the right to foreclose and pull the plug, and gave Sharp its needed consent to the new indebtedness." *Id.* In 1999, the unsuspecting investors purchased an additional $25 million in subordinated notes from Sharp, and Sharp paid State Street roughly $12.25 million from the proceeds. *Id.* The principals gave personal promissory notes for the remaining $2.75 million of the State Street

debt. *Id.* Not long thereafter, Sharp entered bankruptcy.

The Second Circuit affirmed the dismissal of an adversary proceeding against State Street in the bankruptcy court. The court held that State Street did not aid and abet the principals' breaches of fiduciary duty to Sharp, because the bank's actions did not constitute "knowing inducement" of their breach. *Id.* at 50–53. The court explained:

> A person knowingly participates in a breach of fiduciary duty only when he or she provides 'substantial assistance' to the primary violator. Substantial assistance may only be found where the alleged aider and abettor affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur. The mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff.

*Id.* at 50 (internal quotations omitted).[6]

The court rejected the argument that the bank's demand that Sharp obtain new sources of financing after learning of the fraud—specifically to pay off State Street's line of credit—constituted "substantial assistance." *Id.* at 51. The court explained:

> No doubt, a request for repayment does exert some sort of pressure, and any pressure can be seen as an inducement, at least incrementally. But that is an unhelpfully broad reading of inducement in this context. The demand at issue was for no more than was owed: repayment of Sharp's outstanding debt to

---

**6.** Specifically, the court concluded that the following acts by State Street did not constitute knowing inducement: (1) after learning about the fraud, demanding that Sharp obtain new sources of financing to retire the State Street debt; (2) deliberately concealing its knowledge of the fraud at Sharp; (3) electing not to foreclose on the loan; (4) avoiding the noteholders' repeated attempts to reach State Street to discuss the Sharp credit; and (5) providing State Street's contractually required consent to the new loans. *Id.* at 51–52.

State Street. State Street had a right to foreclose (as the complaint alleges); yet State Street evidently did not expect foreclosure to be efficacious. Under the circumstances, the demand for repayment of a bona fide debt is not a corrupt inducement that would create aider and abettor liability.

*Id.* The court also found that State Street's failure to act affirmatively to protect the noteholders did not constitute knowing inducement; the bank had no duty to act, and that the bank's consent to the new loans, although an affirmative act, was not an inducement because it represented the bank's exercise of its right to protect itself—which entailed no duty to consider the interests of anyone else. *Id.* at 52.

*In re Sharp* is analogous to the present case, even though it involves a claim for tortious interference with contract rather than breach of fiduciary duty. *See Ed Peters Jewelry Co. v. C & J Jewelry Co.,* 124 F.3d 252, 277 (1st Cir.1997) (stating that a claim for inducing breach of fiduciary duty is "analogous to a cause of action for intentional interference with contractual relations"); *Liberty Sav. Bank v. Webb Crane Service, Inc.,* No. Civ. A03CV2218REBCBS, 2005 WL 1799300, *7 (D.Colo. July 27, 2005) (following *In re Sharp* in concluding that a lender's efforts to obtain additional security for money it was owed did not amount to an inducement that would sustain a claim of intentional interference with contract); *In re General Plastics Corp.,* 158 B.R. 258, 289 (Bkrtcy. S.D.Fla.1993) ("When the allegedly wrongful act merely creates circumstances leading to the loss of a business relationship, then the element of 'direct interference' has not been satisfied.").

Schwan's cites four acts that are claimed to constitute knowing inducement; the Court will consider each in turn.

First, Schwan's contends that the bank pressured Good Stuff to move aggressively with respect to the collection of prepayments from Schwan's, and that Allard told Good Stuff that the bank was prepared to "choke the company" if it did not collect prepayments. As the court observed in *In re Sharp,* "[n]o doubt, a request for repayment does exert some sort of pressure." 403 F.3d at 52. But the bank's demand that Good Stuff collect prepayments, even coupled with Allard's tough talk, was "for no more than was owed" to repay the advances and supply the collateral required under the formulas of the Agreement. *See id.* Therefore, under *In re Sharp,* "the demand for repayment of a bona fide debt is not a corrupt inducement that would create aider and abettor liability." *Id.*

Second, Schwan's contends that after it made its prepayment, the bank "seized" the prepaid funds and applied them against the loan, which left Good Stuff unable to perform its obligations to Schwan's under the Services Contract. But there is no evidence that the bank applied its prepayments in a manner inconsistent with the terms of the Agreement. Good Stuff used Schwan's prebilled account as collateral for roughly $400,000 in loans under the Agreement, and there is no evidence in the record as to what Good Stuff did with those funds. That Good Stuff did not use that money to perform its obligations to Schwan's under the Services Contract is not attributable to the bank. The bank advanced all funds to Good Stuff required by the Agreement.

Third, Schwan's contends that the bank improperly froze Good Stuff's credit line in June 2002. The bank, however, had no duty to continue to advance funds once Good Stuff's Borrowing Base eroded—even if the bank knew that the practical effect of its decision was likely to be Good

Stuff's inability to perform for its clients. *See In re General Plastics,* 158 B.R. at 288. Rather, the bank was free to take steps to protect itself and its investment without considering the interests of Good Stuff's other debtors. *See In re Sharp,* 403 F.3d at 52; *see also B.E.L.T., Inc. v. Wachovia Corp.,* 403 F.3d 474, 476–77 (7th Cir.2005) (holding that a bank had no duty to inform other lenders of its borrower's financial problems, even though those other lenders' funds were used to pay off the borrower's debt to the bank).

Fourth, Schwan's contends that the bank's actions left Good Stuff unable to perform its obligations to Schwan's under the Services Contract. Again, Good Stuff used the advances from Schwan's as collateral for a loan, as a result of which it received approximately $400,000. Whatever Good Stuff did with that money—which probably went to fund its day-to-day operations—its actions cannot be attributed to the bank.

In summary, on the undisputed evidence, the bank cannot be found to have knowingly induced a breach of contract by Good Stuff. It had the right to collect on its loan, even if the source of funds from which Good Stuff paid down the loan was the advances paid in good faith by Schwan's for services. It therefore cannot be said to have induced the breach of the Services Contract by Good Stuff. Accordingly, plaintiff cannot establish the third element of a claim for tortious interference with contractual relations.

### 2. *Improper Means*

■ Finally, there is no evidence in the record to support the claim that the bank interfered with the contract with an improper motive or by improper means. To prove this element, Schwan's would have to show that the bank acted with actual malice, which is "any spiteful, malignant purpose, unrelated to the legitimate corporate interest." *Shea v. Emmanuel Coll.,* 425 Mass. 761, 764, 682 N.E.2d 1348 (1997); *see also Harrison v. NetCentric Corp.,* 433 Mass. 465, 479 n. 16, 744 N.E.2d 622 (2001).

Schwan's theory is essentially one of deceit or misrepresentation, based in substantial part on a statement made by Allard in a June 6 e-mail to Kelly. That e-mail states that, based on their "discussion and agreement" of that date, a list of actions occurred. One of those actions was: "The Freschetta $150,000 when received is 100% for the company's usage." [7] According to Schwan's, Good Stuff would not have asked for the prepayment, and Schwan's would not have made it, but for Allard's representation.

The circumstances of the "discussion and agreement" referenced in Allard's e-mail are entirely unclear; in his deposition, Allard referred to an effort by the bank to enter a forbearance agreement with Good Stuff so that Good Stuff could find an alternative source of funding. What is clear, however, is that any promise by the bank to make the $150,000 available to Good Stuff for its operations was outside the Agreement, and the bank eventually decided not to advance those funds to Good Stuff.

■ In any event, Schwan's theory fails for multiple reasons. Schwan's was obligated to make the last advance of $150,000 under the Services Contract, regardless of Allard's representation; there is no evidence that Schwan's was aware of Allard's representation; and Good Stuff could not

---

7. The e-mail also contains the following disclaimer: "The Bank still reserves its rights and remedies existing under the Loan and Security Agreement to exercise any and all action necessary to protect our outstanding loans to the Company."

have relied upon Allard's June 6 representation when it sought the final Schwan's prepayment. As to the latter point, Schwan's final prepayment to Good Stuff—which Schwan's was required by the Services Contract to pay—was made by a check dated June 4, 2002, *before* Allard's e-mail containing the alleged misrepresentation.

In short, all of the bank's actions represented "the legitimate advancement of its own economic interest ... which is not 'improper' for purposes of a tortious interference claim." *Pembroke Country Club, Inc. v. Regency Sav. Bank, F.S.B.*, 62 Mass.App.Ct. 34, 39, 815 N.E.2d 241 (2004) (holding that it was not improper for a lender to halt the proposed settlement and discounted payment of plaintiff's loan when the lender believed the loan would otherwise be paid in full); *accord In re General Plastics*, 158 B.R. at 289 (rejecting a tortious-interference claim where the lender's decision to terminate advances was designed "to protect its own economic interests and reduce its risks"). This was clearly related to the bank's legitimate corporate interest. *See Shea*, 425 Mass. at 764, 682 N.E.2d 1348. Plaintiff therefore cannot establish the fourth element of the tortious interference claim.

\* \* \*

The Court's conclusion that the bank cannot be liable to Schwan's has not been reached without considerable misgivings. The bank unquestionably encouraged Good Stuff to collect—indeed, demanded that it collect—hundreds of thousands of dollars in advances from Schwan's in order to pay down its debt, knowing full well that there was little likelihood that Schwan's would ever reap any benefit from the money. It is certainly true that Schwan's obligated itself to pay the advances to Good Stuff, and failed to require security or otherwise protect itself. Nonetheless, it is hard to escape the conclusion that the bank's conduct was somehow wrong, morally if not legally, and that Schwan's has been victimized by its conduct. In the sometimes-harsh world of commercial lending, that is not enough, uncomfortable though that conclusion may be. In the words of the Second Circuit: "One could say that [the bank] failed to tell someone that his coat was on fire; or one could say that it simply grabbed a seat when it heard the music stop. The moral analysis contributes little." *In re Sharp*, 403 F.3d at 52. This Court, reluctantly, agrees.

### Conclusion

For the foregoing reasons, the motion of defendant Commerce Bank & Trust Company is GRANTED.

**So Ordered.**